UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JOSE ORTEGA,<br><br>    Plaintiff,<br><br>    v.<br><br>JO ANNE B. BARNHART,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>    Defendant. | No. CV 05-4437-PLA<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

## I.

## PROCEEDINGS

Plaintiff filed this action on June 23, 2005, seeking review of the Commissioner's denial of his applications for Disability Insurance Benefits and Supplemental Security Income payments. The parties filed a Consent to proceed before the undersigned Magistrate Judge on November 8, 2005. Pursuant to the Court's Order, the parties filed a Joint Stipulation on April 14, 2006, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on July 3, 1945. [Administrative Record ("AR") at 65.] He has a sixth grade education, obtained in Mexico, and a high school equivalency education, completed in the United States.[1] [AR at 42-43, 108.] His past work experience includes employment as a delivery person, a remnant sorter, a warehouse worker, a maintenance worker, and a dishwasher. [AR at 43-47, 103, 122-29.]

On April 21, 2003, plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income payments, alleging that he has been unable to work since March 26, 2003, due to uncontrollable tics, vision problems, and depression. [AR at 21, 66, 85-88, 102, 382-84.] After his applications were denied, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on August 25, 2004, at which plaintiff appeared with counsel and testified through an interpreter on his own behalf. [AR at 38-64.] On October 29, 2004, the ALJ determined that plaintiff was not disabled because he could perform certain of his past unskilled[2] medium work.[3] [AR at 20-29.] When the Appeals Council denied review on May 6, 2005, the ALJ's decision became the final decision of the Commissioner. [AR at 6-9.]

---

[1] Plaintiff completed his G.E.D. in English. [AR at 43.]

[2] "The basic mental demands of...unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Social Security Ruling ("SSR") 85-15, at 4. Social Security Rulings do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

[3] Medium work is defined as work involving "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

## III.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.

## **THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving social security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or that has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

### A. THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant currently is engaged in substantial gainful activity; if so, the

claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied. Id. The plaintiff has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy; the determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

In this case, at step one, the ALJ concluded that the plaintiff has not engaged in any substantial gainful activity since the alleged onset of disability. [AR at 21, 28.] At step two, the ALJ concluded that the plaintiff has the following severe impairments: "neck strain, tic disorder, and anxiety disorder."[4] [AR at 23, 28.] At step three, the ALJ found that plaintiff's impairments do not

---

[4] The ALJ found that plaintiff's vision problems were "not severe within the meaning of the Regulations" because "the quality of [plaintiff's] vision is largely within [plaintiff's] control and does not significantly limit [plaintiff's] physical ability to perform basic work activities." [AR at 22.] Additionally, the ALJ noted that "[t]he record supports that [plaintiff's] vision without glasses is 20/70 in both eyes. However, with corrective lenses his vision is recorded as 20/40 in both

4

meet or equal the requirements of any of the impairments in the Listing. Id. The ALJ further determined that plaintiff has the "residual functional capacity"[5] to perform a significant range of unskilled medium work tasks with certain restrictions.[6] [AR at 24, 28.] At step four, the ALJ concluded that with these functional limitations in place, plaintiff could return to his past relevant work as a warehouse worker, a maintenance worker, and a remnant sorter as he performed those jobs. [AR at 26-27.] Since the ALJ determined that plaintiff could return to his past relevant work, the ALJ found plaintiff not disabled and did not proceed to step five of the analysis. Id.

## V.
## THE ALJ'S DECISION

In the Joint Stipulation, plaintiff argues that the ALJ's nondisability finding is not supported by substantial evidence. Specifically, plaintiff contends that the ALJ: (1) should have re-contacted treating sources at the Hubert Humphrey Comprehensive Health Center to determine the extent of plaintiff's limitations; and (2) did not properly account for plaintiff's deficiencies in concentration, persistence and pace in determining plaintiff's ability to work. Joint Stipulation ("Joint Stip.") at 4-5, 8. For the reasons explained below, this matter is remanded for further proceedings.

**A.   THE EVIDENCE**

At the hearing conducted on August, 25, 2004, plaintiff testified to "having spasms in [his]

---

eyes." Id. Plaintiff also testified that he should wear prescription glasses but does not currently have any. [See AR at 62.] In the Joint Stipulation, plaintiff does not contest the ALJ's conclusion concerning his vision.

[5]   Residual functional capacity ("RFC") is what a claimant can still do despite existing exertional and nonexertional limitations. Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[6]   Those restrictions include: no "frequent head or neck movements, frequent overhead work, climbing or working at heights, working around moving machinery or frequent public contact and interaction." [AR at 24.] Plaintiff was also restricted to no more than occasional bending, kneeling, stooping, crouching, or crawling. Id.

face around the eye area." [AR at 47.] He also stated that the spasms caused him "difficulty" in his job because he was "making a lot of errors" when "writing down on a paper." Id. He further explained that he stopped working in March, 2003, because of the "physical problem that [he] had with [his] eyes" and "gastritis in [his] stomach." Id.

When asked about the frequency of his spasms, plaintiff indicated that they occur "all of the time." [AR at 48.] However, when the ALJ asked why the spasms were not occurring at the hearing, plaintiff said they stop when he is "not doing any type of activity like, for example, moving [his] arms or talking too much." [AR at 48.] He explained that with "any type of movement or rapid movement, [he] would begin to get convulsions right away that affect[] [his] head" and "[he is] not able to concentrate." [AR at 48, 54.] When asked about the effects of his medications, plaintiff reported that they help control the shaking "a little." [AR at 50.][7]

Plaintiff received treatment from the Hubert H. Humphrey Comprehensive Health Center ("Humphrey") from May 29, 2002, through July 26, 2004. A chest x-ray from the Humphrey clinic in November, 2002, showed no evidence of acute or active cardiopulmonary pathology, but did reveal old calcified granuloma in the left lower lobe. [AR at 313]. A neck x-ray from the same time showed moderate degenerative cervical changes at C5-7, but the soft tissues were found to be normal and there was no thickening or swelling. [AR at 314]. Furthermore, progress notes repeatedly describe plaintiff's neck as being "supple" and with "no menengeal signs." [AR at 327, 334, 340, 344, 351; see also AR at 259.]

Plaintiff was also treated at the Augustus Hawkins Clinic ("Augustus") from January 29, 2003, through July 26, 2004. Treating sources there initially diagnosed plaintiff with Parkinson's disease, but that diagnosis was subsequently ruled out and plaintiff was instead diagnosed with anxiety disorder, not otherwise specified ("NOS"), and tic disorder NOS. [AR at 361, 364, 368.] At Augustus, plaintiff mainly complained of anxiety and depression and was prescribed Zoloft by

---

[7] Plaintiff reported during his internal evaluation with Dr. Alexandre Mihelson on June 18, 2003, that "Ibuprofen improves the pain" in his chest and neck. [AR at 257.]

his treating physician. [AR at 357-80, 364.] Plaintiff reported to his counselor in March, 2004, that he had been cleared by his neurologist to work. [AR at 358.]

Additionally, plaintiff was treated at the Martin Luther King, Jr./Drew Medical Center ("Martin Luther King") from March 27, 2003, through June 9, 2003. At the hearing, plaintiff testified that his mental problem is "a physical problem that [he has] in [his] head," and indicated that the doctors at Martin Luther King "told [him] that [he] did not have any mental problem." Plaintiff also confirmed that he was not on medication at the time of the hearing for any mental problems. [AR at 51-52.]

On June 18, 2003, Dr. Alexandre Mihelson performed an internal medicine evaluation on plaintiff. [AR at 257-61, 301.] Plaintiff complained primarily of chest pain that also traveled up to his neck. Dr. Mihelson concluded that plaintiff's lungs were "clear to auscultation and percussion" and "within normal limits." [AR at 259.] His impression was that plaintiff had "[a]typical chest pains" and "[n]eck pain with a slightly decreased range of motion, likely due to sprain, strain." [AR at 261.] Dr. Mihelson made a functional assessment that imposed certain postural and environmental limitations, opining that plaintiff's "actual tick or jerking of his neck" should restrict him to occasional "bending, kneeling, stooping, crouching and crawling," and that he should also avoid "walking on uneven surfaces, climbing ladders or stairs." [AR at 261, 301.]

On August 20, 2003, Dr. Christopher H. Ho performed a complete psychiatric evaluation on plaintiff. [AR at 273-77.] Plaintiff reported that he had a "mental disorder and gastritis." [AR at 273.] Dr. Ho noted that plaintiff had a "noticeable jerking of his neck, facial grimacing and blinking of his eyes" but "no history of psychiatric hospitalization." [AR at 274-75.] In his functional assessment, Dr. Ho opined that plaintiff "has motor tics of his neck and facial muscles" that "may be disruptive physically and socially" but that he "can follow simple instructions and was able to do tasks." [AR at 276.] Dr. Ho concluded that from a psychiatric standpoint, plaintiff's prognosis "is guarded" and he "would have difficulties with more complex adjustments" but "is able to make simple social, occupational and personal adjustments." Id.

Non-examining State Agency consultants concluded that while plaintiff had no exertional limitations for work, certain postural activities should be limited to "occasional." [AR at 263-70.]

7

Additionally, they noted that plaintiff was "not significantly limited" in most mental categories and could follow simple instructions, maintain attention and concentration, and sustain an ordinary work routine. [AR at 296.] They opined that plaintiff was only "moderately limited" in his ability to understand, remember, and carry out detailed instructions, and in interacting with the general public. [AR at 296-99.]

After reviewing the evidence in the record, the ALJ concluded that despite plaintiff's "problems with neck strain, a tic disorder and an anxiety disorder," the "opinions of treating and examining practitioners support the findings regarding [plaintiff's] ability to perform work-related activities." [AR at 25.] The ALJ also noted that "[plaintiff's] allegations are substantially credible but still do not restrict his ability to perform some work related activities based on the medical evidence." [AR at 26.] Thus, the ALJ concluded that plaintiff could return to certain of his past work that consists only of "unskilled medium work tasks." [AR at 25.]

**B.   THE ALJ FULFILLED HIS DUTY TO FAIRLY AND FULLY DEVELOP THE RECORD**

Plaintiff contends that the ALJ did not fulfill his duty to develop the record because he should have re-contacted treating sources at Humphrey to get a specific statement regarding "the extent of his limitations." Joint Stip. at 4, 8. The ALJ has "an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). This duty extends to the represented as well as the unrepresented claimant. However, it is heightened when the claimant is unrepresented or mentally ill. Id. An ALJ's duty to develop the record is triggered only when there is "ambiguous" evidence or when the record is "inadequate" to allow for proper evaluation of the evidence. Id.; see 20 C.F.R. §§ 404.1512(e), 416.912(e); Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998) (record considered inadequate, prompting ALJ's duty, where doctor provided a "check-the-box form" opinion without supplying the underlying basis for his opinion).

Despite the ALJ's duty, however, the plaintiff bears the burden of proving that he is disabled. Mayes, 276 F.3d at 458; see 42 U.S.C. § 423(d)(5) ("An individual shall not be

1  considered to be under a disability unless he furnishes such medical and other evidence of the
2  existence thereof as the Commissioner of Social Security may require."). Therefore, the plaintiff
3  bears a responsibility to provide evidence that can be used "to reach conclusions about [his]
4  medical impairment(s) and, if material to the determination of whether [he] is blind or disabled,
5  *its effect on [his] ability to work on a sustained basis*."  20 C.F.R. § 404.1512(a); see also §
6  416.912(a)[8] (emphasis added).

7        Based on the aforementioned standard, and under the circumstances presented here, the
8  ALJ did not err in not contacting Humphrey practitioners concerning the extent of plaintiff's
9  limitations. Eichelberger v. Barnhart, 390 F.3d 584, 592 (8th Cir. 2004) ("the burden of persuasion
10 to prove disability and to demonstrate RFC remains on the claimant") (citing Snead v. Barnhart,
11 360 F.3d 834, 838 (8th Cir. 2004)). The ALJ's duty is prompted only if, without that statement,
12 the record would be considered incomplete such that the ALJ could not make an appropriate
13 disability determination. Such is not the case here.

14       First, this is not an instance where the Humphrey practitioners provided a functional
15 limitation opinion that was unsupported by objective medical evidence. Instead, the record
16 includes objective medical findings without a supporting functional assessment opinion. As a
17 general rule, the record will be considered "inadequate" or "ambiguous" when a treating source
18 has provided a medical opinion that is not supported by the evidence. See Bayliss v. Barnhart,
19 427 F.3d 1211, 1217 (9th Cir. 2005) ("An ALJ is required to recontact a doctor only if the doctor's
20 report is ambiguous or insufficient for the ALJ to make a disability determination.") (citing 20
21 C.F.R. §§ 404.1512(e), 416.912(e)); Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).

---

[8] "Evidence" includes: (1) objective medical evidence, i.e., medical signs and laboratory findings; (2) other evidence from medical sources, e.g., medical history, opinions, and statements about treatment the plaintiff has received; (3) statements the plaintiff or others make about the plaintiff's impairments, restrictions, daily activities, efforts to work, or any other relevant statements the plaintiff makes to medical sources during the course of examination or treatment or during interviews, on applications, in letters, and in testimony in administrative proceedings; (4) information from other sources described in § 404.1513(d); and (5) decisions by any governmental or non-governmental agency about whether the plaintiff is disabled or blind. See 20 C.F.R. §§ 404.1512(b); 416.912(b).

Failure to provide a functional statement, however, does not make the findings of the Humphrey doctors incomplete. When viewing the record as a whole, the radiological findings and objective medical evidence provided by Humphrey medical sources (see supra) is sufficient to support the ALJ's nondisability conclusion.

Second, the ALJ did not dismiss the opinions of the Humphrey practitioners.[9] Instead, the ALJ afforded their assessments "significant weight" and considered their diagnoses when determining plaintiff's lack of disability. In his decision, the ALJ noted that "the county practitioners have monitored [plaintiff's] condition over a long period of time and derive their opinions from objective findings and radiological results." [AR at 25.] The ALJ relied on those findings and results from Humphrey when making his disability determination.

The Court, therefore, finds that the record was neither "inadequate" nor "ambiguous" merely because the Humphrey practitioners failed to provide a specific functional assessment. The regulations provide that treating sources will only be recontacted if they provide a report that "contains a conflict or ambiguity that must be resolved, ... does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1512(e)(1); 416.912(e)(1). The record here *does* include substantial objective medical evidence including radiological and clinical assessments from the Humphrey practitioners. [AR at 304-55.]

Thus, the Court finds no error in the lack of follow-up by the ALJ with the Humphrey practitioners. There is no indication in the record by *any* treating source that plaintiff is limited in his work activities. In fact, neither plaintiff's neurologist; consultative examiners Dr. Mihelson and Dr. Ho; nor non-examining State Agency sources indicated that plaintiff was precluded from performing all work activities. [See AR at 257-62, 263-70, 273-77, 358.] The Court finds that

---

[9] Plaintiff relies on a case in which the ALJ erred by not recontacting a treating doctor before assigning his opinions no weight. See Joint Stipulation at 4; O'Donnell v. Barnhart, 318 F.3d 811, 816, 818 (8th Cir. 2003) (ALJ did not fulfill his duty to develop the record when he assigned *no weight* to treating neurologist's opinion without acquiring additional evidence to support what the ALJ concluded were "conclusory" treatment records). The records in the instant case, on the other hand, were not inadequate, and the ALJ gave the Humphrey practitioners' assessments significant weight.

1 recontacting sources at Humphrey is neither required nor probative since the ALJ's conclusion
2 is based on substantial evidence in the record. See Magallanes v. Bowen, 881 F.2d 747, 750 (9th
3 Cir. 1989) ("In determining whether the Commissioner's findings are supported by substantial
4 evidence, we must review the administrative record as a whole, weighing both the evidence that
5 supports and the evidence that detracts from the Commissioner's conclusion.").

6 Additionally, the Court notes the Report of Contact dated December 4, 2003, which
7 indicates the Humphrey doctors' refusal to sign documents to confirm plaintiff's disability. [AR at
8 134.]  The regulations specify that seeking additional evidence from a medical source is
9 unnecessary "when we know from past experience that the source either cannot or will not provide
10 the necessary findings." 20 C.F.R. §§ 404.1512(e)(2); 416.912(e)(2). Therefore, despite plaintiff's
11 contention, it appears that the Humphrey practitioners were unwilling to provide a disability
12 statement.

13 Plaintiff also argues that the ALJ should have recontacted the Humphrey practitioners
14 because Dr. Mihelson, the consultative examiner, was recontacted.  However, Dr. Mihelson
15 produced an ambiguous functional assessment which prompted the ALJ's duty to recontact.
16 Specifically, Dr. Mihelson opined that plaintiff had postural limitations but did not specify the
17 frequency of those limitations. See Bayliss, 427 F.3d at 1217 ("An ALJ is required to recontact a
18 doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability
19 determination.").  On the other hand, the lack of a functional limitation assessment from the
20 treating sources at Humphrey does not make the record ambiguous. The radiological results and
21 objective medical findings, along with the record as a whole, are sufficient to determine plaintiff's
22 ability to work. The ALJ's decision is supported by substantial evidence, as the medical evidence
23 did not show that plaintiff was unable to work. Accordingly, the ALJ was not required to recontact
24 the Humphrey practitioners for a supplemental functional statement.
25 /
26 /
27 /
28 /

### C.   THE ALJ DID NOT PROPERLY ACCOUNT FOR PLAINTIFF'S LIMITATIONS IN CONCENTRATION, PERSISTENCE OR PACE

Plaintiff's remaining argument challenges the ALJ's finding regarding plaintiff's mental functional limitations. Plaintiff asserts that the ALJ's assessment that plaintiff has moderate limitations in maintaining concentration, persistence, or pace conflicts with the conclusion that plaintiff can perform his past unskilled medium work. Joint Stip. at 8-9; see AR at 23. In particular, plaintiff maintains that the moderate limitation would inhibit his ability to perform even unskilled medium work, and that the ALJ's finding to the contrary is not supported by substantial evidence. Joint Stip. at 3, 9. Plaintiff also contends that the ALJ should have called a vocational expert ("VE") to testify concerning the impact of plaintiff's non-exertional impairments on his ability to perform his past work. Id. at 3, 9-10.

To support his VE contention, plaintiff relies on cases holding vocational testimony was necessary when assessing non-exertional limitations at step five. See, e.g., Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988); Rosario v. Shalala, 836 F. Supp. 257, 260-62 (E.D. Pa. 1993). The Court finds plaintiff's reliance on these cases to be misplaced. In those cases, vocational testimony was required because the claimants had impairments that precluded them from returning to their past relevant work. Consequently, reliance on vocational testimony was probative to suggest jobs that the claimants could perform in the economy given their severe non-exertional impairments.

Here, however, the ALJ determined at step four that plaintiff could return to certain of his past work. [AR at 26-27.] Therefore, despite plaintiff's non-exertional impairments, use of a vocational expert was not required. See Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993) (vocational expert testimony is "useful, but not required" at step four of sequential evaluation of disability); see also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996) (plaintiff "assert[ed] that the ALJ erred by failing to call a vocational expert pursuant to step five of the sequential evaluation... In the fourth step of the evaluation, however, the ALJ determined that [plaintiff's] impairment did not prevent him from performing past relevant work;" thus, vocational expert testimony was unnecessary). However, an ALJ is certainly permitted to use a VE at step four to

determine past relevant work. See, e.g., Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001)(where ALJ took VE testimony concerning plaintiff's past relevant work at step four). Nevertheless, the ALJ's decision to bypass vocational testimony is permissible and does not constitute legal error at this step.

This does not end the analysis, however, as the Court finds that the ALJ did not adequately account for plaintiff's mental limitations in assessing his ability to perform his past work. The regulations provide the applicable procedure for evaluating mental impairments. "The procedure requires the evaluator to: (1) determine whether a mental impairment exists by recording pertinent symptoms and limitations; (2) determine whether 'certain medical findings which have been found especially relevant to the ability to work are present or absent'; (3) determine whether the impairment is severe by rating the degree of functional loss resulting from the impairment; (4) determine whether the impairment, or a combination of impairments, meet or equal a mental disorder listed in 20 C.F.R. pt. 404, subpt. P, app. 1; and (5) complete a residual functional capacity assessment." Maier v. Commissioner, 154 F.3d 913, 914-15 (9th Cir. 1998); 20 C.F.R. §§ 404.1520a, 416.920a.

Initially, the ALJ followed the aforementioned standard in evaluating plaintiff's mental limitations. For example, the ALJ reviewed the medical evidence and found that plaintiff's medically determinable impairments included neck strain, tic disorder and anxiety disorder. [AR at 23.] The ALJ then considered plaintiff's mental limitation by rating his four relevant psychiatric areas of functioning. 20 C.F.R. §§ 404.1520a(c)(3)-(4), 416.920a(c)(3)-(4). First, he noted plaintiff's "activities of daily living" and found mild[10] restrictions. [AR at 23.] Second, he concluded that plaintiff was moderately limited in "social functioning." Id. Third, in plaintiff's disputed area,

---

[10] "When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme . . . The last point on [the] scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).

"maintaining concentration, persistence, or pace," the ALJ also found a moderate limitation.[11] Id. Fourth, due to lack of support in the record, the ALJ found no limitations in "decompensation or deterioration of plaintiff's mental impairments." Id. Finally, based on his mental impairment analysis and the psychiatric evidence provided by Dr. Ho, the ALJ concluded that plaintiff's mental impairment was "severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." [AR at 23.]

Following the mental evaluation, the ALJ proceeded to determine plaintiff's RFC. After considering plaintiff's exertional and non-exertional limitations, the ALJ found that plaintiff retained the RFC to perform "unskilled medium work tasks which do not involve frequent head or neck movements, frequent overhead work, climbing or working at heights, working around moving machinery or frequent public contact and interaction which would preclude jobs requiring dealing with the public." [AR at 24.] The ALJ supported his mental RFC finding by affording "significant weight" to Dr. Ho, who tested plaintiff's concentration, memory, and attention. [AR at 25.]

The ALJ then turned to plaintiff's former employment. He had questioned plaintiff about his job responsibilities at the three jobs he determined he could perform.[12] [AR at 58-61; see also AR at 122-29, 135-36.] As for the warehouse job, plaintiff testified that he "was just simply there stacking the product that was coming out of the machine" and did not operate the machine. [AR

---

[11] The ALJ, consistent with Regulation guidelines, specifically supported his conclusions concerning concentration, persistence and pace with the psychiatric evaluation conducted by Dr. Ho. [AR at 23]; see 20 C.F.R. §§ 404.1520a(c), 416.920a(c); 12.00C3 of the Listing of Impairments, Appendix 1, Subpart P, Part 404 ("*Concentration, persistence or pace* refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings...[M]ajor limitations in this area can often be assessed through clinical examination or psychological testing."). Based on his examination of plaintiff, Dr. Ho opined that plaintiff might have problems making "complex adjustments," but that he could "make simple social, occupational and personal adjustments." Further, the ALJ noted plaintiff's testimony that his tics and movements of the head make concentration difficult, although medication helps control the shaking. [AR at 23.] Accordingly, the ALJ determined that plaintiff was moderately limited in this area.

[12] The ALJ determined that plaintiff could only return to three of his last five jobs: warehouse worker, maintenance worker, and remnant sorter. [AR at 28.]

at 59.] When asked to describe his maintenance job, plaintiff said "[i]t dealt with cleaning, emptying trash cans. Sweeping and emptying the trash cans." Id. Lastly, plaintiff said his work as a remnant sorter included "look[ing] over the bags and remov[ing] the bags that were old or were not good anymore, and separat[ing] them from the good bags, and just separat[ing] the good bags from the bad bags." [AR at 60.] The ALJ concluded that plaintiff can return to his past jobs as a warehouse worker, maintenance worker, and remnant sorter as he performed them. [AR at 26.] He further concluded that the occupational base would not be significantly eroded by plaintiff's non-exertional limitations. But the limitations examined by the ALJ to reach that conclusion did not include those of concentration, persistence or pace. [AR at 27.]

While plaintiff has the burden of proving disability up through step four, "[t]his is not to say . . . that the ALJ is relieved of his burden to make the appropriate findings to insure that the claimant really can perform his or her past relevant work." Pinto, 249 F.3d at 845. While the evaluation of psychiatric impairments under 20 C.F.R. § 404.1520a and § 416.920a is used to determine if a claimant is disabled under the Listing, this same data must be considered at subsequent steps when, as here, the mental impairment is found to be severe. SSR 85-15 provides:

> the sequential evaluation process mandated by the regulations does not end with the finding that the impairment, though severe, does not meet or equal an impairment listed in Appendix 1 of the regulations. The process must go on to consider whether the individual can meet the mental demands of past relevant work in spite of the limiting effects of his or her impairment and, if not, whether the person can do other work, considering his or her remaining mental capacities reflected in terms of the occupational base, age, education, and work experience. The decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work.

Further, "all limits on work-related activities resulting from the mental impairment must be described in the mental RFC assessment." SSR 85-16. While some of plaintiff's disputed limitations may have been accounted for by the ALJ in his reliance on Social Security Ruling 85-15, which defines the basic work demands of unskilled work as including an ability to understand and carry out simple instructions, deal with changes in the usual work situation, and make simple work-related decisions [AR at 27], those definitions do not necessarily encompass potential

15

problems related to basic work habits needed to maintain employment. See, e.g., Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996) (reference in hypothetical to simple jobs was insufficient to describe and accommodate concentration difficulties); Bielat v. Commissioner, 267 F.Supp.2d 698, 702 (E.D. Mich. 2003) (a reference to "unskilled, sedentary work" is not sufficient to describe deficiencies in concentration); Edwards v. Barnhart, 383 F.Supp.2d 920, 930-31 (E.D. Mich. 2005) (noting that the ALJ's limitations on plaintiff interacting with co-workers, supervisors and the public and to jobs entailing no more than simple, routine unskilled work, "[w]hile close" to a moderate limitation in concentration, persistence and pace, "did not fully convey Plaintiff's limitations in concentration to the VE."). With his limitations, plaintiff may not be able to meet quotas, stay alert, or work at a consistent pace, even if his job is simple, unskilled, and routine. The ALJ's RFC simply does not account for the moderate limitation he found to exist, or use adequate alternate job restrictions that would suitably account for his limitation. Neither did the ALJ discuss in his opinion whether plaintiff could maintain the pace of his prior work, or what the pace entailed. Indeed, plaintiff's former jobs appear to each require some degree of sustained concentration (dealing with machinery), and/or persistence and pace (keeping up with quotas or production requirements). Further, no examining psychiatrist has characterized plaintiff's limitations in this regard as minimal or negligible. Indeed, Dr. Ho's Global Assessment of Functioning[13] score of 45 [AR at 276] indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV at 34. Dr. Ho also indicated that while plaintiff can following simple instructions and do tasks, can interact with others and can arrange transportation, plaintiff's tics "may keep him from being able to function and do tasks as they may be disruptive physically and socially." Plaintiff's prognosis was "guarded." [AR at 276.] Plaintiff's

---

[13] A Global Assessment of Functioning score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. 1996) (hereinafter "DSM IV").

mental limitations cannot be ignored in determining the tasks that plaintiff is capable of performing. Remand is warranted.

## VI.

## **REMAND FOR FURTHER PROCEEDINGS**

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision. See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984). In this case, remand is appropriate to further assess plaintiff's ability to perform his past work in light of the finding that he is moderately limited in concentration, persistence or pace. The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

DATED: September 11, 2006

/S/
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE